**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

VANTAGE COMMODITIES FINANCIAL
  SERVICES, LLC,

                              Plaintiff,              Case. No.: 20-cv-02978 (PAE)(GWG)

        v.

MACQUARIE INVESTMENTS US, INC.,
PRASHANT MUPPARAPU, and OZZIE
PAGAN

                              Defendants.
————————————————————/

### VERIFIED AMENDED COMPLAINT FOR DAMAGES

Vantage Commodities Financial Services, LLC ("Vantage"), by and through its undersigned counsel, and for its Amended Complaint against the Defendants MACQUARIE INVESTMENTS US, ("Macquarie"), PRASHANT MUPPARAPU, and OZZIE PAGAN (collectively, the "Macquarie Defendants"), and hereby states as follows:

### INTRODUCTION

Plaintiff Vantage comes to this Court seeking redress from blatantly unethical, tortious, and illegal acts driven by the intense greed of the Macquarie Defendants and their agents Prashant Mupparapu and Ozzie Pagan.  In short, the Macquarie Defendants, affiliates of the Macquarie Group Limited—the world's largest infrastructure asset manager with assets under management of $542.7 Billion— desperately needed to cover up a bad investment in Vantage to avoid losses by making sure that internal numbers stayed high and bonuses would continue to be paid. Macquarie covered the loss the only way it could, by lying to and bullying one of its other clients that had a strong balance sheet and also relied on Macquarie's capital to keep operating its business and coerced them to "acquire" Macquarie's bad investment.  The ultimate result of that coerced transaction was the bankruptcy of two entities and clients of Macquarie, Big Apple Energy, LLC

("Big Apple") and Clear Choice Energy, LLC ("Clear Choice"), and the destruction of Plaintiff Vantage.  The equity value in Vantage destroyed by the Macquarie Defendants and Mupparapu is in excess of $120 million, and Vantage now finds itself on the verge of its own bankruptcy as a result of Macquarie Defendants actions.

In fact, the Macquarie Defendants' conduct in using its clients to cover its own mistakes and losses was so egregious that Macquarie Energy North America Trading, Inc.'s Executive Director, Ozzie Pagan, admitted to Vantage's CEO Victor Ferreira[1] that Macquarie would have fired Mupparapu had it known of the actions he took against Vantage and Big Apple, both clients of Macquarie and a company that Mupparapu was a fiduciary and Board member.  An excerpt of a transcript of the recorded conversation between Ferreira and Pagan is included in the pleading.  Of course, Macquarie and Pagan offered no relief to Ferreira or his companies, although Mupparapu's actions directly benefitted Macquarie, hid significant losses, and allowed investment bankers to play various conflicted roles and get rich in the process by using their clients as pawns in their own game of chess to get bigger bonuses.

## PARTIES

1.      The Plaintiff, Vantage, is a Delaware limited liability company with operations in New York and is engaged in the business of providing financing to deregulated energy services companies ("ESCOs").  The members of Vantage are: Big Apple Energy, LLC and Clear Choice Energy, LLC.  Big Apple Energy, LLC and Clear Choice Energy, LLC are controlled by Richard L. Stern, in his capacity as the Chapter 7 Trustee for those entities in a bankruptcy proceeding in the Eastern District of New York.

2.      Defendant Macquarie Investments US, Inc., is a Delaware corporation.

3.      Prashant Mupparapu is an individual who, upon information and belief, resides in Kings

---

[1] Victor Ferreira was the Chief Executive Officer of Big Apple Energy, LLC, Clear Choice Energy, LLC, and became and remains the CEO of Vantage after being induced to cause Big Apple Energy, LLC to acquire Vantage.

County, New York.

4.      Ozzie Pagan is an individual who, upon information and belief, resides in Houston, Texas.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the dispute arises under the laws of the United States, and pursuant to 18 U.S.C. § 1367 because all other claims are so related that they form part of the same case or controversy.  Venue properly lies in this Court pursuant to 28 U.S.C. § 1391 because the a substantial part of the events or omissions giving rise to the claim occurred in this Judicial District and a substantial part of property that is the subject of the action is situated.

6.      All conditions precedent have occurred, been performed or have otherwise been waived.

7.      Vantage has retained the undersigned law firm to prosecute this action and has agreed to pay the law firm a reasonable fee for its services, plus out of pocket expenses.

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

*A.      Macquarie Gives Vantage a $50 Million Credit Facility. Vantage Has Financial Problems, Macquarie Unsuccessfully Tries to Manage Vantage, and Macquarie Panics.*

8.      In October 2014, Plaintiff Vantage entered into a $50 Million credit facility with Macquarie Bank Limited.  After entering into the credit agreement, Mupparapu, an employee of Macquarie, took a seat on Vantage's board of directors to presumably participate in oversight and governance of Vantage.

9.      Unfortunately for Macquarie and Mupparapu, their $50 million bet on Vantage did not go as planned, as Vantage ran into significant financial problems almost immediately after Macquarie extended the credit facility.

10.     Upon information and belief, Macquarie, with Mupparapu in a dual role as Macquarie employee and Vantage board member, attempted to influence the management decisions of Vantage so that it would be able to pay off the credit facility.  This did not work, as Vantage continued to have financial problems.

**B**.   ***Macquarie and Mupparapu Separately Strike a Deal with Big Apple Energy, LLC***

11.     In October 2014, Victor Ferreira, the Chief Executive Officer of Big Apple Energy,

LLC, had a meeting with Mupparapu about obtaining a credit facility for Big Apple.  At the time,

Ferreira and Big Apple had no affiliation with Vantage and only remotely knew of Vantage's

existence, although the two companies both operated in the energy business.

12.     Macquarie agreed to provide Big Apple with the $25 million credit facility. Big

Apple entered into a Borrowing Base Facility Agreement with Macquarie on July 1, 2015.

**C.**   ***Mupparapu Tries to Pawn Off Vantage on Big Apple***

13.     Six days after Big Apple obtained its $25 million credit facility from Macquarie,

Mupparapu requested a meeting with Ferreira to discuss Vantage, which at the time was not well

known to Ferreira.

14.     At the meeting, Mupparapu told Ferreira that Macquarie took over as Vantage's lender

seven months before, but despite jettisoning its problem account, Glacial Energy, the company

had gotten into financial trouble again because of another bad loan that Vantage had made, this

time to Iron Energy.  Mupparapu said that he could only salvage Vantage by combining it with a

company having a strong balance sheet and asked Ferreira to entertain merging with Vantage.

15.     Ferreira agreed to discuss the potential business combination and entered into a non-

disclosure agreement in order to obtain the necessary diligence.

16.     Vantage was slow to provide diligence and it became clear that J. Scott Perry, the then

current and former CEO of Vantage ("Perry") would only be interested in a merger if he were put

in charge of the combined companies. Ferreira declined to move forward under those

circumstances and notified Vantage and Mupparapu that he was no longer interested in merging

with Vantage.

17.     Upon information and belief, Macquarie, with Mupparapu in a dual role as

Macquarie employee and Vantage board member, then made a deal with Vantage that awarded Macquarie an option that would allow Macquarie to take over Vantage's stock for $1.

18.     Upon information and belief, this was an attempt by Macquarie to gain further control over Vantage and prevent the company from declaring bankruptcy, which would force Macquarie to acknowledge its failed venture and the non-viability of its investment in Vantage, not to mention a significant write-down in the value of its investment.

19.     A month after Ferreira notified Vantage that it was not interested in merging, Mupparapu, again as an employee of Macquarie and board member of Vantage, contacted Ferreira again, this time with a "plan" for Big Apple to acquire Vantage.  Mupparapu explained that Macquarie negotiated an option to acquire Vantage for $1.

20.     Mupparapu explained that he was afraid that Perry, the former CEO of Vantage, would cause Vantage to declare bankruptcy.  Mupparapu explained to Ferreira that this could not happen as it would "surface" Macquarie's losses related to Vantage and would have an adverse effect on him and his employer Macquarie.  Mupparapu told Ferreira that he didn't want Perry to know what was happening in the background so he would have Macquarie respond to all due diligence requests of Big Apple and Ferreira.

21.     Mupparapu recommended that Macquarie sell its option to Big Apple for $1 and have Big Apple "acquire" Vantage so that its balance sheet could be combined with Big Apple's balance sheet as part of a transaction where Big Apple would also be coerced to assume an untenable amount of Vantage's historical debt to Macquarie. This scheme would enable Macquarie to use its leverage over Big Apple and "kick the can down the road" of realizing the huge loss that existed within Vantage.

22.     Mupparapu stated that Macquarie had done all the due diligence for the acquisition on

behalf of Big Apple.  Mupparapu also promised that Macquarie would assign to Ferreira a tax deduction for the write off of losses incurred by the owners of Vantage to remedy personal tax liability[2] as part of any transaction.

23.    Macquarie's due diligence proved to be incomplete and unsupported, including accounting summary documents without underlying accounting data.  Ferreira was inclined to not go forward with Mupparapu's proposed transaction.

24.    On March 11, 2016, Mike Delucia ("Delucia"), an associate of Mupparapu, forwarded to Ferreira financial projections for Vantage. Delucia represented that Vantage was close to "breaking even" and would be making net income of about $700,000 per month within a year.  Delucia also said Vantage had $13 million in debt, and that Macquarie would ask Big Apple to guarantee only $10 million of the debt.  The original projections that Delucia forwarded to Ferreira on December 17, 2015 had Vantage making on average of $90,000 in net income per month.

25.    On Monday March 21, 2016, Ferreira met with Mupparapu at Macquarie's offices. Ferreira told Mupparapu that he was concerned about the degradation of Vantage's balance sheet and having second thoughts on doing the Vantage transaction. At that time, Mupparapu told Ferreira that if Big Apple did not acquire Vantage, his entire group at Macquarie would "go under", which would affect Big Apple's credit facility, which was also being handled by Mupparapu and his practice group.  Mupparapu claimed that he was only looking out for his group members, as he would personally be safe because he had more than energy in his portfolio.

26.    On March 29, 2016, Ferreira had not yet made a decision on whether to proceed with the transaction. Another person from Mupparapu's group at Macquarie, Rachel Cahan, emailed Ferreira.  Cahan began to question Big Apple's borrowing base reports[3], essentially stating that,

---

[2] The extreme weather event of January and February of 2014 called the Polar Vortex had left Big Apple with a high level of aged receivables due to Big Apple's clients being unable to make payment. Big Apple reported on an accrual basis and that left Ferreira with a significant personal tax liability.

[3] The borrowing base report was the mechanism for determining Big Apple's ability to borrow money from Macquarie. Ferreira had been submitting weekly borrowing base reports for almost a year and had never had any material issues or concerns raised by Macquarie.

under a strict interpretation of the Big Apple credit agreement, Big Apple had exceeded its current borrowing limits. Big Apple had submitted a borrowing base showing $830,000 in availability, Cahan calculated the availability to be a negative $4,460,000, excluding a significant amount of accounts receivable that Macquarie had access to and should have included in its calculation.

27.     Ferreira believed this to be punishment for refusing to do the Vantage deal, as Macquarie faced mounting financial pressure: Macquarie's fiscal year end was March 31, 2016. If the Vantage deal did not get done by that time, Macquarie's auditors would have forced the company to recognize the Vantage loss.

28.     The truth (and which was found out by Ferreira and Big Apple after closing) is that Vantage was not on the verge of profitability and maintained about $24 million in debt.  Mupparapu made these representations after Macquarie assumed the duty to provide all due diligence for Big Apple, one of its important borrowers in the energy business.

29.     Based on the inducements, misrepresentations, and strong-arm tactics of Macquarie, Ferreira decided to cause Big Apple to purchase the option from Macquarie for $1 and acquire Vantage.

30.     Of course, as a condition of the purchase, Mupparapu would remain an employee of Macquarie and a board member of Vantage.

31.     The transaction did not require amortization of the reported $13 million legacy debt in recognition to the fact that the legacy debt was the embodiment of Macqurie's losses and not the result of real borrowings of the business. As a result, Vantage was only required to remit a portion of its profits to Macquarie to service the legacy debt.

32.     Big Apple purchased Vantage on April 12th, 2016.

**D**.     ***Mupparapu and Macquarie Use the Purchase of Vantage by Big Apple to Pull Out as Much Value as Possible—Driving Big Apple into Bankruptcy and Vantage to the Verge of Insolvency***

33.     When Big Apple took over Vantage, the company was not close to breaking even as Macquarie had promised; however, Ferreira and Big Apple made the best of it, working to overcome Vantage's management issues and bringing the company to a place where it truly would break even by May 2017.

34.     In June 2016, Ferreira convened a meeting of Vantage's board at which Mupparapu was present. Ferreira advised the board members that two months after taking over Vantage, Big Apple was now in violation of its Tangible Net Worth covenant. Ferreira also discovered that Macquarie had already taken the tax benefit it promised to Ferreira as part of the purchase transaction.

35.     Mupparapu and Macquarie, having now combined the balance sheets of Big Apple and Vantage to conceal an investment that was apparently so bad it would destroy an entire lending group at one of the world's largest banking institutions, now wanted more as 2016 was ending and bonuses were to be calculated.

36.     In the fall of 2016, Mupparapu and Macquarie proposed a new credit structure with Big Apple and Vantage.  In return for amending the tax returns to give Ferreira the benefit they originally said promised him as the inducement to buy Vantage, Macquarie wanted Big Apple to begin amortizing the legacy debt, meaning that Macquarie would no longer only accept payments from the profits of Vantage and would now look to Big Apple to service the legacy debt if Vantage was unable to do so. In order for the IRS to accept the amended Macquarie tax returns the new deal structure would have to be signed off on by December 31, 2016. For Macquarie to amend their tax returns Ferreira had to agree to amortization as the quid pro quo.

37.     Big Apple and Vantage objected to this change, as it would require millions of dollars in yearly payments to Macquarie to service legacy debt that had nothing to do with Big Apple's business.

38.     Ferreira, and Big Apple's investment banker, Steve Grossman, objected to Macquarie's position on amortization now being mandated.

39.     This did not sit well with Mupparapu.  Mupparapu knew that with the tax losses having been claimed by Macquarie, Ferreira was up against the IRS deadline. Mupparapu knew that if Ferreira refused to accept the new amortization requirements, not only would the tax losses permanently belong to Macquarie but, Big Apple would still have liability for the legacy debt and that Ferreira would most likely be forced to file for personal bankruptcy due to the personal tax liabilities. Mupparapu resisted multiple requests by Ferreira and Grossman to reduce the amortization requirement.

40.     On December 30, 2016, still having no agreement relating to the amortization requirement, Ferreira called for a conference call with Mupparapu and Grossman.  Ferreira was concerned about the level of amortization and its impact on Vantage and Big Apple's liquidity. Mupparapu joined the call from a family event in India.

41.     On the call, Mupparapu was incensed that Ferreira was pushing back on the amortization requirement.  He angrily said that if Ferreira did not go forward with the new payment schedule, he and Macquarie would "come back and take Vantage".

42.     Mupparapu stated that he was "rejuvenated and refreshed" and that if Ferreira didn't do the deal that he would come back to run Vantage and that then he "would take over the market". Ferreira clearly saw this as a threat from Mupparapu that would destroy Big Apple's relationship with all of its clients.  Mupparapu was and remained a board member of Vantage at that time.

43.     Based upon this threat and fearing serious harm to Big Apple and Vantage and potential the loss of the tax losses (which was a fundmamental premise of the original deal), Ferreira had no real choice but to acquiesce to the amortization schedule which was to commence in July 10, 2017 even though it would stress the cash flows of his business.

***E.      Mupparapu and Macquarie Destroy Big Apple's Initial Public Offering***

44.     In March 2017, with Big Apple's leadership, Vantage began to improve to the point that its mezzanine lender, a company called Penta Mezzanine Fund ("Penta"), approached Ferreira about taking Big Apple and Vantage public through a structure called a Special Purpose

Acquisition Company ("SPAC").  Ferreira initially declined the offer.

45.     In the summer of 2017, Penta asked Ferreira to reconsider, as it would infuse capital into the companies and allow the companies to rely less on debt.  By that time, Big Apple had already made a payment of $1,500,000 to satisfy the legacy debt amortization requirement. Big Apple was a guarantor on the debt and needed to make the payment if Vantage was unable to.

46.     At that time, Vantage had just become barely profitable, largely because Atlantic Energy, a Big Apple client, had entered into a lending agreement with Vantage. Atlantic was growing beyond Big Apple's abilities to finance it and the strategy had always been to transition Big Apple lending activities to Vantage because of the Vantage lending structure.

47.     The transfer of Atlantic finally made Vantage consistently profitable, however; still not so profitable enough as to service amortization requirements on the legacy debt to Macquarie. Atlantic provided LED light bulbs as part of its service offering and had to carry sizeable amount of inventory which Vantage financed. Upon information and belief, in October 2017, Mupparapu reached out directly to Pat Linden ("Linden"), President of Atlantic under the guise of wanting to connect Linden to a software provider. Mupparapu then proceeded to offer that Macquarie could finance Linden's bulb purchases directly, effectively taking that business revenue opportunity away from Vantage. Linden declined the offer. Mupparapu was engaging in this conversation two months after having had voted, as a board member of Vantage, to approve the process of going public.

48.     Once Vantage stabilized, Ferreira was unable to get the support of Macquarie for future deals Vantage was contemplating.  Macquarie's "Vantage problem" had, in its mind, been solved, and it turned to other deals and did not allow Vantage to grow to be able to service the debt. Mupparapu remained a director of Vantage, an employee of Macquarie, and the principal banker for the Vantage account.

49.     Ferreira recognized that the amortization payments were unsustainable given Macquarie's lack of support for Vantage and decided to enter into an agreement with the SPAC whereby Big

Apple Energy would go public. Big Apple Energy had been and was consistently profitable and Vantage had started to perform. Ferreira needed to sell part of his company in order to bring in capital and increase liquidity.

50.     Ferreira called a meeting of the Vantage board to discuss the SPAC transaction. Mupparapu was present in his capacity as a member of the Vantage Board of Directors. Representatives of Big Apple's investment bank were present to provide details on the SPAC and the potential benefits of the transaction. The transaction contemplated raising $15 million of capital, and a vote passed unanimously by all board members including Mupparapu.

51.     Big Apple commenced the process of going public which included redoing three years of financial audits to meet Public Company Accounting and Oversight Board Standards. The entire process of going public cost Big Apple over $2 million.

52.     Ferreira and Big Apple's investment banker Grossman had several meetings with Mupparapu to discuss the offering. Mupparapu even attended a road show presentation describing the offering and the use of proceeds from the deal. The benefit of increased liquidity for the company was highlighted during these presentations.

53.     Under Big Apple's lending agreements Macquarie's consent was required if Ferreira and his wife sold any of their ownership in the company, giving Macquarie veto rights over the transaction. During a conversation with Ferreira, Mupparapu advised that Macquarie was, for no apparent reason, expecting to receive $5 million of the proceeds from the public offering to pay down legacy debt.

54.     Ferreira and Grossman advised Mupparapu that doing so would defeat the purpose of going public and believed they convinced Mupparapu of the unreasonableness of his demand. The process of going public was costly and legacy debt payments still needed to be made.

55.     Upon information and belief, Mupparapu and Macquarie knew the $5 million demand was unreasonable, but the demand had ulterior motives.

56.     Mupparapu had griped to Ferreira on several occasions that his group's cost of capital within Macquarie was high because of the legacy debt at Vantage. If Mupparapu was successful in securing a payment on the legacy debt, his group's cost of capital would be lowered resulting in higher profits for Mupparapu and Macquarie. The $5 million dollar legacy debt paydown was not discussed or contemplated during the board meeting at which Mupparapu approved the SPAC transaction. In a meeting between Pagan and Ferreira on July 11, 2018 Pagan acknowledged that he was aware that there would be some paydown of the legacy debt but did not know that an amount had been specified. It appears that the request for the $5 million paydown was being driven by Mupparapu more than Macquarie. Ferreira came to know that Mupparapu's group cost of capital was in fact being negatively impacted by their past issues with Vantage.

57.     On March 28, 2018, Ferreira put in a request to fund a bonus for Vantage's President as per his employment agreement. The employment agreement had been vetted by Macquarie and it was understood that the bonus was calculated based on the prior year's profits but no less than $200,000. Vantage had not turned profitable until the second quarter of 2017. For 2016 Ferreira paid the bonus from Big Apple because Macquarie would not allow the payment to come from Vantage.

58.     On April 3, 2018 Ferreira received an email from Bosco Lai ("Lai"), Senior Vice President at Macquarie and a direct report to Mupparapu. Lai was pushing back on the request to fund the bonus. Lai's email read:

> "Given the time constrain we want to provide with some quick feedback. We have just been able to improve our internal rating on Vantage based on the improvements in Vantage's performance over the latter part of 2017 and [are] hoping to continue to demonstrate that. This bonus payment will change the result quite significantly and have a negative impact [on] Vantage – these would again make future consents/ approvals more challenging. Can we pay this out of BAE instead? Assuming the [profitability] continues at Vantage this year this shouldn't be an issue next time around."

59.     In his email Lai acknowledges that Mupparapu's group had been negatively impacted by Vantage's past losses under Mupparapu's watch. Lai also acknowledges that despite Ferreira

solving Macquarie's Vantage problem, internally Vantage was still viewed as a troubled account. Lai's email indicates that paying the bonus from Vantage would "again make future consents/approvals more challenging". Vantage was being subjected to discriminatory lending standards preventing it from reaching its potential. At the same time Big Apple was subject to amortization requirements on the legacy debt that was never part of the original Vantage transaction. With Macquarie not allowing Vantage to grow the burden would fall on Big Apple.

60.     Believing that the legacy debt pay-down issue was resolved, Big Apple went forward with the process of going public, hiring professionals, undergoing audits and promoting the offering in roadshows. Mupparapu's presence at the roadshow was viewed as an indication of Macquarie's support and consent for the transaction.

61.     Upon information and belief, during the roadshow process, Mupparapu met with one or more private equity firms to engage in discussions whereby the private equity firm would take control of Vantage away from Big Apple.

62.     Upon information and belief, Mupparapu engaged Cahan to assist in this process. Mupparapu was not authorized by the board to engage in any activities that would undermine the SPAC process.

63.     On March 28, 2018, Ferreira asked for a meeting with Mupparapu to finalize details for the public offering. Believing that a call was suggested, when Ferreira showed up at Macquarie's Manhattan offices Mupparapu maintained that he did not have a conference room available and suggested meeting in the Starbuck's on the ground floor.

64.     At the meeting, Ferreira indicated that everything was progressing with the public offering and advised Mupparapu that Macquarie's consent was needed to complete the transaction.

65.     To Ferreira's utter disbelief, Mupparapu continued to maintain that a $5 million pay down of the legacy debt was a requirement for Macquarie to consent to the deal. There were several conversations with Ferreira, Grossman and Mupparapu leading up to this meeting where it was made clear that no debt payment would be forthcoming. There was also a one on one meeting with

Grossman and Mupparapu where the same message was conveyed and Mupparapu agreed that it was in Big Apple's best interests to strive for increased liquidity. Two months prior Big Apple had to make another $1,500,000 legacy debt payment. Liquidity was tight and the SPAC had already faced a shareholder lawsuit for entering into the agreement to sponsor Big Apple in the first place. A $5 million drain on liquidity was never disclosed in the offering documents nor on the roadshow, including the one that Mupparapu attended both in his capacity as a board member and a Macquarie employee. To proceed under the conditions that Mupparapu had just laid out would almost certainly bring about additional shareholder lawsuits. Ferreira left the meeting unsure as to what to how to proceed.

66.     Ferreira conferred with Grossman and it was decided to attempt to pursue a

different path through a private equity transaction instead of the public offering. Over the next few weeks, meetings were held with various lenders and Big Apple was able to secure tentative offers of support for a private equity investment and a larger mezzanine loan facility.

67.     On April 25, 2018, Ferreira texted Mupparapu to ask if they could have a meeting. Mupparapu asked for Ferreira to explain the purpose of the meeting. Ferreira replied that he cancelled the public offering and that he needed to meet because he expected liquidity issues over the next few months.

68.     Ferreira and Mupparapu met the following day at which time Ferreira apprised Mupparapu of the reasons that the offering was cancelled and the reason for the liquidity crisis. Big Apple had spent over $2 million on the public offering process and in addition had been drained of $3 million in Vantage legacy debt payments. Ferreira advised Mupparapu that the legacy debt would have to be restructured. Mupparapu knew that what laid in front of him was another negotiation involving Vantage legacy debt.

69.     Mupparapu advised Ferreira that Macquarie would be sending Macquarie

personnel to Big Apple's offices to go through financial data. In the subsequent weeks and months, Macquarie personnel and their outside audit firm had a constant presence at Big Apple and Vantage.

70.    On Wednesday May 30, 2018, Ferreira was travelling back from Albany when he learned from a third party that Mupparapu had resigned from Macquarie.

71.    Ferreira called Cahan to find out about Mupparapu's departure. Cahan asked if she could call right back and within a minute called Ferreira back with Pagan, her superior, on the line.

72.    Cahan and Pagan proceeded to tell Ferreira that they had no detailed information on Mupparapu's departure but would reach out to him to ask that he make contact. Mupparapu called Ferreira shortly thereafter. During the conversation Mupparapu indicated that he did not have an offer from another firm and was just exploring his options. Macquarie's fiscal year end is March 31, 2018. Bonuses are awarded on May 31, 2018.

73.    Mupparapu *still* remained on Vantage's board of directors at that time.

74.    During the call with Pagan, Pagan indicated that he would be travelling to New York to meet with Macquarie clients regarding Mupparapu's departure with the intent being to meet with Ferreira on Tuesday June 5, 2018.

75.    Mupparapu texted Ferreira at 3:59 PM on Tuesday June 5, 2018 saying they he and Pagan had tried to reach him.   That is the last communication that Ferreira received from Mupparapu.

76.    Ferreira texted back for Mupparapu to call him but got no reply. Ferreira reached out to Cahan to get her assistance in tracking down Pagan and Mupparapu. Later that day, Ferreira learned that Pagan had already left New York for Houston. Ferreira finally contacted Pagan and confirmed a meeting in Houston on Monday June 11, 2018.

77.     On Monday June 11, 2018, Ferreira met with Pagan and the remaining members of Mupparapu's team. Cahan was present along with Lai. The parties discussed Vantage's deal pipeline and the difficulties that Vantage was having in getting Macquarie to approve new deals. Ferreira believed that Macquarie's Risk Management Group had been imposing requirements for Vantage deals that were unattainable and not reflective of standard industry practices, a belief that comports with the April 4, 2018 email from Lai. Vantage's inability to grow past break-even and the impending legacy debt payment was going to create liquidity problems for Big Apple. After some discussion Pagan told Ferreira that he wanted to confer with his team leaving Ferreira alone in the conference room. Shortly thereafter Pagan returned by himself indicating that his team didn't need to be there for the rest of the discussion

78.     Pagan continued the conversation with Ferreira regarding the liquidity issues, and Pagan demonstrated a desire to work with Big Apple to resolve the liquidity shortfall. Ferreira advised Pagan that Big Apple would not have the liquidity to pay the $1,500,000 legacy debt payment due July 10, 2018.

79.     During these conversations Pagan asked for more details on the relationship with Mupparapu and the genesis of the Vantage transaction. Ferreira proceeded to tell Pagan about the undue pressure exerted by Mupparapu to have Ferreira save his group and the threats to take over Vantage if he didn't acquiesce to the new amortization requirements. Pagan agreed that Mupparapu's actions were a fireable offense as is made clear in the excerpt from the transcript of the conversation that Ferreira recorded:

Ferreira:     So, if you knew that Prashant had essentially put the burden of his group staying afloat on my shoulders for something that it was not my fault, that that was ... that he essentially held out there that if I don't do this deal these people are going to lose their jobs, and it'll be on me.

Pagan:        Yeah, Prashant would've had a problem with me. I probably would've fired him.

80.     Ferreira discussed his conversations with Mupparapu regarding the conditions for Macquarie's consent in order to approve the public offering. Mupparapu had represented that the

conditions were being dictated my management. Pagan represented that the demands for Macquarie's approval were different than what Ferreira had described. Pagan commented "So, he may have been negotiating inside differently from outside". Mupparapu at all relevant times was a director of Vantage with an unequivocal fiduciary duty to Vantage. We believe that Mupparapu was making efforts to extract more concessions than Macquarie was requiring in order to benefit personally as a result of his group's reduced debt level and reduced cost of capital.

81.     Pagan was surprised that Ferreira had never been introduced to Nick O'Kane ("O'Kane"), Executive Director at Macquarie with responsibilities for all of Macquarie's operations in North and South America.  Big Apple was a sizeable client of Macquarie and Mupparapu had once mentioned to Ferreira that he would introduce him to O'Kane but never did.

This is despite the fact that Ferreira was at a Macquarie gathering in Park City where O'Kane and Mupparapu were present. We believe that Mupparapu's failure to make the introduction was intentional in an effort to control the narrative within Macquarie.

82.     On June 20th, 2018 Macquarie sent a third-party firm to review Big Apple's books and records. Big Apple was a logistics and finance provider in the deregulated energy market. Big Apple had provided Macquarie with weekly borrowing base reports and had been subject to monthly third-party audits for the past 35 months with no issues or concerns raised of any significance or materiality. The audit report's conclusions were that Big Apple's receivables consisted of supply purchases and working capital loans which was consistent with the core financing structure that Big Apple offered. Macquarie's typical clients in the retail energy space were third-party energy retailers. Big Apple provided services to third-party energy retailers along with financing as did Vantage. Vantage's lending facility allowed for working capital loans. Macquarie determined that Big Apple's receivables related to working capital loans were ineligible. Mupparapu understood Big Apple's business model. Ferreira was unable to persuade Macquarie that Big Apple's business model was different than any of its other clients. On June 29th, 2018 Big Apple received a notice of default.

F. *Relevant Past Interactions with Macquarie Personnel*

83.     In the past Ferreira had attempted to engage Macquarie personnel in the nuances of Big Apple's business model. Shortly after Big Apple became a client of Macquarie's in July 2015 Ferreira was engaging with Vantage to gather due diligence. Vantage management was not being forthcoming during the process. On Monday September 7, 2015, in an email chain related to the diligence process, Mupparapu asked if Ferreira was still going to attend a meeting the next day at Macquarie's offices with Duncan Church ("Church"), Macquarie's Head of Global Risk. Church was in from Houston to meet with Vantage. In his email Mupparapu asks "Are you still up for meeting Duncan in the afternoon, just as an introduction, not related to Vantage". On Tuesday September 8, 2015, Ferreira met with Church. After Church and Ferreira shook hands they sat down and Church asked "So – what are we going to do about Vantage". Ferreira believed that the purpose of the meeting was to acquaint the Head of Global Risk with Big Apple and the nuances of its business model, Mupparapu's email made that very clear. Instead the discussion centered on Macquarie's troubled client. In the winter of 2016 while at a Macquarie gathering in Park City Utah Ferreira came to meet Pagan for the first time at a local bar where Macquarie was hosting its clients. Ferreira was talking with Lai when Pagan walked past. Lai stopped Pagan to introduce him to Ferreira, principal at Big Apple at which point Pagan replied, "I know Big Apple, I'm interested in Big Apple - when are we getting this deal done?" Macquarie's interest in Big Apple appeared to be linked to its ability to assist with Vantage. Ferreira's encounters with Macquarie personnel reinforced a belief that he had no allies within Macquarie. There was at least one other instance where Macquarie's indifference to Big Apple's business model was evident. Mupparapu had hired a consultant, Tracey Duffy ("Duffy"), to review operations at Big Apple and Vantage. At the end of the review process in March 2017, upon information and belief, Duffy advised Lai that Macquarie did not appreciate the nuances of the Big Apple business model and its lending needs. There is no evidence that Lai ever acted on Duffy's recommendations. In March 2017 Big Apple had yet to make its first debt amortization payment and any change to the borrowing base structure

would have limited the ability of Big Apple to fund future amortization payments and Ferreira would have demanded a renegotiation of the Vantage legacy debt. Macquarie's year end is March 31st, bonuses are paid out by May 31st.

**G.    *Macquarie Declares Default***

84.     After Macquarie declared default it took over control of Big Apple's bank accounts and severely restricted access to capital. Lai became the point person for Macquarie and its interactions with Ferreira and Big Apple. Ferreira was working to increase liquidity in any way possible to ensure that bills were paid timely. In the energy industry, payments terms are extremely rigid especially in the electric markets which are administered by Regional Transmission Operators that oversee the electric grid. Failure to pay these weekly invoices and post collateral in a timely manner would result in Big Apple being declared in default with 48 hours to cure. Failure to cure a payment default in the 48-hour time frame would have resulted in the loss of Big Apple and its clients' licenses to operate in the electric markets. If Big Apple could not maintain liquidity, it and all its clients would be out of business in 48 hours. Macquarie severely restricted Big Apple's access to capital to pay operating expenses, at one point Macquarie refused to fund Big Apple payroll because it had inadvertently been left off a weekly budget.

85.     Ferreira continued to pursue a private equity investment and negotiate with Macquarie to have it understand that the driving force behind the Big Apple liquidity shortfall was the Vantage legacy debt payments and that there were no inherent issues with Big Apple's operations.

86.     An all hands call was had on Sunday July 22, 2018 to discuss a potential forbearance agreement. During that call Ferreira brought up several underlying facts in the Big Apple/Macquarie relationship including actions taken by Mupparapu.

87.     Ferreira was concerned about the level of manipulation that had been exerted by Mupparapu and demanded a meeting with O'Kane

88.     O'Kane agreed fly up the next day for a meeting with Ferreira. The next day there

was severe weather in the Eastern half of the country and O'Kane's flight was cancelled. Ferreira flew down to Houston that evening and met with Pagan and O'Kane on Tuesday July 24, 2018.

89.     During the meeting with Pagan and O'Kane, Ferreira discussed the interactions with Mupparapu leading up to the Vantage transaction and the subsequent negotiations on the amortization. Ferreira discussed the interaction with Church, his discussions with Duffy, the initial meeting with Pagan and the potential unauthorized discussions that Mupparapu was having with buyers for Vantage and the possibility of SEC violations associated with those conversations as Mupparapu was a member of the board of Vantage. O'Kane acknowledged that he was aware that Mupparapu was a member of Vantage's board.

90.     Pagan and O'Kane alleged to not have knowledge of Mupparapu's efforts to market Vantage, however, Macquarie must have given Ferreira's claims some credence. On Tuesday August 21, 2018 a meeting was held in Grossman's offices to introduce Pagan to a private equity firm that was prepared to invest in Big Apple. After the meeting, Ferreira told Pagan that, upon information and belief, he had heard that Cahan had assisted Mupparapu in setting up meetings with private equity firms to take Vantage over. Pagan was surprised to hear that since Pagan represented that Macquarie looked into Mupparapu's email account and did not find anything unusual.

**H.      *Macquarie interferes with Vantage's client in order to destroy Big Apple***

91.     Macquarie continued to exert complete control over Big Apple's and Vantage's finances creating significant liquidity issues for Big Apple and forced Ferreira to find ways to increase liquidity however possible.

92.     Vantage provided financing for Atlantic Energy, while Big Apple provided energy supply. At the end of July 2018, Ferreira presented an invoice to Atlantic for the month's supply costs and requested that payment be made the following week, sooner than the typical arrangement but within the contractual rights of Big Apple to ask for. Atlantic agreed and submitted a request to Vantage for funding the Big Apple charges.

93.     On July 31, 2018, Lai sent Linden a written email communication asking for Linden to confirm that "there are no economic terms between BAE and Atlantic related to this early payment that has not been disclosed". Lai was never given authority to contact Vantage's clients. Linden interpreted this as Macquarie accusing him of willfully paying a padded invoice in an effort to increase liquidity at Big Apple. Linden confirmed that the invoice was for product and services delivered. Macquarie released funds to Vantage for Atlantic to pay the Big Apple invoice.

94.     Macquarie continued to severely constrain Big Apple's cash flow. On Tuesday August 21, 2018, Grossman held a meeting in his offices to introduce Pagan to the principal of Ferreira's prospective private equity investor. The term sheet was discussed, demonstrating that after the transaction Big Apple would have increased liquidity and a stronger balance sheet.

95.     On Thursday August 23, 2018, Ferreira needed Macquarie to release approximately $1,800,000 from the account Macquarie controlled to pay for electric capacity. Ferreira needed to pay an invoice for July 2018 so that a purchase of a similar amount could be made for September. Ferreira had made the request two days prior. Failure to release the funds would have forced Big Apple to post additional collateral to the New York Independent System Operator ("NYISO"). The deadline for paying the invoice was 5:00 PM on Thursday. The account Macquarie controlled held in excess of $4,000,000. Ferreira tried contacting Macquarie several times during the day to find out when the funds would be released. An email was sent by Macquarie that requested a conference call for 5:00 PM that day. On the call Pagan indicated that Big Apple's line was being pulled. The call lasted less than two minutes. Big Apple was unable to pay its vendor and as a result incurred a collateral call from NYISO of $3,200,000. Macquarie swept the funds from the controlled account leaving Big Apple with no money to pay NYISO for the weekly invoices.

96.     On Monday August 27, 2018 Big Apple and Clear Choice filed for bankruptcy protection. Because of the rapid turn of events Big Apple had not secured bankruptcy financing. The situation was extremely precarious because if Big Apple did not get funding and clear its default with NYISO it along with all of its clients would be out of business by Wednesday. As consideration

for receiving financing in bankruptcy from Macquarie, Big Apple was required to provide a release to Macquarie for any claims that it had.

97.     Macquarie become the Debtor-in-Possession ("DIP") lender to Big Apple. Macquarie aggressively challenged rulings by the court and motions from attorneys for Big Apple and Big Apple clients. Big Apple received an initial round of DIP financing at the start of the bankruptcy. On September 12, 2018 a hearing was held in Bankruptcy Court before The Honorable Judge Alan S. Trust in the Eastern District of New York.

98.     Big Apple was requesting additional funds from the DIP facility. It was common in the industry for significant sums of money to be paid on the 20th of each month. Big Apple was anticipating $6,000,000 to come in the following week but needed money to pay invoices in two days. Failure to pay those invoices would have caused Big Apple to be in default with NYISO and would have again resulted in all of Big Apple's clients being in danger of going out of business.

99.     During the bankruptcy process attorneys representing Big Apple clients made arguments to segregate some of the funds due to an unresolved issue as to whether sales tax revenue flowing through Big Apple should be set aside since it was a trust fund obligation and a personal liability of the company principals. At the hearing on September 12, 2018, Macquarie had indicated that they would agree to fund the new DIP request if their entire DIP facility was paid back when the funds were available on the 20th of the next week.

100.    Judge Trust ruled that there were unresolved trust fund issues and he was not in position to allow Macquarie to sweep funds to pay their DIP facility off. Macquarie objected to Judge Trust's ruling; Judge Trust denied their objection. Macquarie notified Judge Trust that they would not be providing additional financing and were terminating their DIP facility, refusing to fulfill its obligations under the DIP agreement. Judge Trust expressed displeasure with Macquarie's actions. Judge Trust addressed Ferreira and told him "Mr. Ferreira I can't force them to lend but I will give you use of cash collateral to keep your clients in business, do what you can".

101.    Ferreira needed to find a way to increase liquidity. Failure to pay its bills timely would cause significant collateral damage. Ferreira reached out to Linden and requested that Atlantic pay its August natural gas bill. Atlantic submitted a request to Vantage for payment of valid expenses that had already been accrued on its borrowing base report. Included in that request was the Big Apple natural gas invoice. Payment of the Big Apple invoice was an ordinary course transaction. Atlantic submitted the request to Vantage and Vantage forwarded the request to Michael Pituch ("Pituch"), analyst at Macquarie. Since the bankruptcy Pituch was the point person at Macquarie for the release of funds.

102.    On Friday September 14, 2018 at 1:42 PM Pituch emailed Atlantic's controller to advise him that Macquarie was "still reviewing the Big Apple early payment item can you please break out your request so we can fund the remainder of your request". Macquarie was approving all of the invoices Atlantic had submitted except for the Big Apple invoice. At 2:42 PM that same day Linden received an email from Pagan with the subject line "Tried calling you". Linden found this to be highly unusual as Pagan is the head of the energy group for Macquarie and he had never spoken directly with him previously. In the email Pagan says that he had tried to call him but got voicemail. His email then indicated that Pagan wanted to speak to Linden about "this non regular course early payment request".

103.    Linden returned Pagan's call. Pagan told Linden that had been watching Atlantic's business from afar and praised Atlantic's operations and management team and that Macquarie "would love to continue doing business with Atlantic" in the future (regardless of what happens with Vantage and Big Apple).  He then moved to discussing the request to pay the Big Apple invoice sooner than what had been done in the past. Linden viewed the request as an ordinary course transaction. It was a request to pay a properly accrued liability.

104.    Pagan questioned whether that would be a sound business decision. Pagan said that he and Macquarie would consider it "foolish" for a good operator such as Linden to request payment earlier than it had been done in the past. Linden understood the ramifications of Big Apple not

being able to pay its bills on time. Linden believed that Macquarie understood the ramifications also. Linden agreed to pull back the request for funding of the Big Apple invoice. Linden hung up the call and went into the common area and told the staff that was present "WOW – This is getting dirty".

105.    Based on this interaction, it became apparent to Vantage and to Ferreira that Pagan was not genuine about having a "problem" with Mupparapu. In fact, Pagan simply just took Mupparapu's place, attempting to bleed Vantage dry and position itself to work with ESCOs like Atlantic as part of Macquarie's self-interest in "taking over the market".

106.    Despite Macquarie's pulling of their DIP facility and refusing to fund Atlantic's request, Ferreira was able to cobble together enough money to keep all but one of its clients in business through the 20th. Once Big Apple received the money on the 20th it did not need any financing from Macquarie to continue operations. Macquarie continued to harass Atlantic on funding requests that it made through Vantage.

107.    Atlantic viewed Macquarie's actions as endangering its business.

108.    After receiving the call from Pagan, Linden spoke with Ferreira about terminating his agreement with Vantage, and having to pay a $500,000 early termination fee to do so.  Ferreira, concerned about the business relationship and hoping he could restore it, discussed waiving or amending the $500,000 fee.

109.    When Ferreira asked Macquarie about restructuring the termination fee, Pagan was clear with Ferreira that he was required to collect the entire fee from Atlantic, and that if he did not do so, Macquarie would remove him as Chief Executive Officer of the company, despite Ferreira exercising his clear business judgment.

110.    After being pressured by Macquarie, Vantage sought the full fee, and Atlantic terminated their agreement with Vantage and paid the $500,000 early termination fee in order to move to a new lending facility. In his email notifying Vantage of the termination Linden copied Pagan and stated that Macquarie was "making the situation untenable for Atlantic". The loss of Atlantic

caused Vantage to swing from being a profitable company to one that is barely breaking even and on the verge of insolvency. *See* Affidavit of Atlantic Energy Chief Executive Officer, Patick Linden, attached as **Exhibit A**.

111.    Mupparapu, Lai, Pituch and Delucia are no longer employed by Macquarie. Upon information and belief, Cahan had been on maternity leave and is now working as a contract employee at Macquarie.

## COUNT I—VIOLATION OF FEDERAL RICO STATUTE, 18 USC § 1962
### (Against Macquarie)

112.    Vantage reincorporates paragraphs 1 through 111 as if stated fully forth herein.

113.    As stated herein, and for a period from 2014 through the present, Macquarie acted as a criminal enterprise, associated together with Pagan, Cahan, Lai, O'Kane, Mupparapu, and others, for a common purpose of engaging in criminal conduct.

114.    This enterprise engaged in interstate conduct between New York, Texas, Utah, Australia, India, and other locations to further its criminal conduct.

115.    As stated herein, Macquarie engaged in multiple predicate criminal acts, including criminal interference with commerce by threats of violence through the use of extortion and strong-arm fear tactics, putting Vantage, its customers, and Vantage through extortionate threats to customers, in fear of economic loss and ultimate financial ruin. Macquarie's criminal activity went so far as to actually alienate Vantage's customers, impair its business operations, and ultimately ruin the enterprise value of Vantage's business.

116.    As stated herein, from the period of 2014 through the present, Macquarie has engaged in multiple acts, and a prolonged pattern of extortion that goes well beyond ethical business practice, including the incitement of fear and intimidation to gain an economic advantage over its own client, and to place Vantage and its clients in imminent fear of economic ruin. Macquarie went so far, and intentionally damaged client relationships of Vantage in an attempt to coerce and

manipulate Vantage for its own financial gain, that Vantage is now on the verge of insolvency, and has lost essentially all of its customers.

117.     Macquarie is not stopping there.  It is currently conspiring with the Chapter Seven Trustee in the bankruptcy of Vantage's two shareholders, Big Apple Energy, LLC, and Clear Choice Energy, LLC, to sell Vantage to Macquarie to block the claims contained herein from coming to light.  *See In re: Big Apple Energy, LLC and Clear Choice Energy, LLC*, Case Nos. 1875807, 18-70508, jointly administered, ECF No. 581 (E.D.N.Y.).

118.     Vantage has attempted to share the facts of this claim with the Trustee's counsel; however, Trustee's counsel has refused to review this complaint or the facts giving rise to it.

119.     These acts by Macquarie and its agents have caused Vantage damages by destroying its customer relationships, all of its enterprise value, and wringing it of all economic value to enrich Macquaries as much as possible before trying to buy the shell that is now Vantage for de minimus value to stamp out its clear and egregious criminal acts.

**WHEREFORE**, the Plaintiff, Vantage Commodities Financial Services, LLC, respectfully requests that this Court take jurisdiction over this Count I and enter judgment in its favor for damages in an amount not less than $120,000,000, pre-judgment and post-judgment interest, and for such other relief as the Court deems equitable and just.

## COUNT II—BREACH OF FIDUCIARY DUTY
### (against Macquarie)

120.     Vantage reincorporates paragraphs 1 through 111 as if stated fully forth herein.

121.     As a lender to Vantage that, amongst other acts, exercised significant control over Vantage's affairs, had specific business expertise in the deregulated power and power finance business, and maintained in its employ Prashant Mupparapu, who also acted as a director of Vantage at relevant times, Macquarie established a fiduciary relationship with Vantage beyond a mere arms'-length lender relationship.

122.     Despite representations in Macquarie's standard loan documents, Macquarie went well beyond the bounds of engaging in normal lender-borrower activity when it took a position on the Vantage board, consistently used its position as a lender to control Vantage and its business decisions, and created issues between Vantage and its own clients in a self-professed effort to "take over the market" and presumably invest in ESCO businesses for itself to the detriment of Vantage.

123.     Moreover, because Mupparapu acted within the scope of his employment with Macquarie while serving as a director of Vantage, Macquarie is vicariously liabile for the tortious acts of Mupparapu.

124.     As stated in this Complaint, Macquarie, as a fiduciary of Vantage, engaged in willful misconduct and self-dealing to enrich itself and its employees at the expense of Vantage, ultimately causing Vantage to go from a once-promising company that was being managed to significant profitability, to a company with only one significant client on the verge of insolvency.

125.     As a result of the acts of Macquarie, Vantage's enterprise value has been reduced to nearly $0 and the company has lost millions of dollars in potential revenue.

          **WHEREFORE**, the Plaintiff, Vantage Commodities Financial Services, LLC, respectfully requests that this Court take jurisdiction over this Count II and enter judgment in its favor for damages in an amount not less than $120,000,000, pre-judgment and post-judgment interest, and for such other relief as the Court deems equitable and just.

<u>**COUNT III—BREACH OF FIDUCIARY DUTY**</u>
**(against Mupparapu)**

126.     Vantage reincorporates paragraphs 1 through 111 as if stated fully forth herein.

127.     As an employee of Macquarie, director of Vantage, and principal investment banker to borrower Vantage that, amongst other acts, exercised significant control over Vantage's affairs and had specific business expertise in the deregulated power and power finance business, Mupparapu owed specific fiduciaries duties to Vantage.

128.     As stated in this Complaint, Mupparapu, as a fiduciary of Vantage, engaged in

willful misconduct and self-dealing to enrich himself and his employer at the expense of Vantage, ultimately causing Vantage to go from a once-promising company that was being managed to significant profitability, to a company with only one significant client on the verge of insolvency.

129.    As a result of the acts of Muparrapu, Vantage's enterprise value has been reduced to nearly $0 and the company has lost millions of dollars in potential revenue.

WHEREFORE, the Plaintiff, Vantage Commodities Financial Services, LLC, respectfully requests that this Court take jurisdiction over this Count III, and enter judgment in its favor for damages in an amount not less than $120,000,000, pre-judgment and post-judgment interest, and for such other relief as the Court deems equitable and just.

### COUNT IV—BREACH OF FIDUCIARY DUTY
**(Against Pagan)**

130.    Vantage reincorporates paragraphs 1 through 111 as if stated fully forth herein.

131.    As an employee of Macquarie, and successor as principal investment banker to borrower Vantage that, amongst other acts, exercised significant control over Vantage's affairs and had specific business expertise in the deregulated power and power finance business, Pagan owed specific fiduciaries duties to Vantage.

132.    As stated in this Complaint, Pagan, as a fiduciary of Vantage, engaged in willful misconduct and self-dealing to enrich himself and his employer at the expense of Vantage, ultimately causing Vantage to go from a once-promising company that was being managed to significant profitability, to a company with only one significant client on the verge of insolvency.

133.    Specifically, Pagan essentially took over for Mupparapu, who wanted to "take over the market" after he suddenly left Macquarie and resigned from Vantage's board of directors.  Pagan contacted at least one major Vantage client and convinced him to sever ties with Vantage, stating that Macquarie would like to work with that client in the future.  This type of self-dealing and exertion of control over Vantage went beyond any arms'-length borrower-lender relationship, and was committed after the signing or applicable period for any releases between the parties.

134.    As a result of the acts of Pagan, Vantage's enterprise value has been reduced to nearly $0 and the company has lost millions of dollars in potential revenue.

WHEREFORE, the Plaintiff, Vantage Commodities Financial Services, LLC, respectfully requests that this Court take jurisdiction over this Count IV, and enter judgment in its favor for damages in an amount not less than $120,000,000, pre-judgment and post-judgment interest, and for such other relief as the Court deems equitable and just.

### JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: June 19, 2020                  Respectfully submitted,

**SHERRY LAW OFFICE, PLLC**

*/s/ Jason B. Sherry*
JASON B. SHERRY, ESQ.
200 SE 1st St., Ste. 400
Miami, Florida 33131  Tel:
(305) 792-4265
jason@sherrylawoffice.com

-  and  -

**FASANO LAW FIRM, PLLC**

MICHAEL C. FASANO
(*pro hac vice forthcoming*)
S. Biscayne Blvd.
Suite 1750
Miami, Florida 33131  Tel:
(786) 530-5239
mfasano@fasanolawfirm.com

*Counsel for Vantage Commodities Financial Services, LLC*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

VANTAGE COMMODITIES
FINANCIAL SERVICES, LLC,

                         Plaintiff,                    Case. No.:

     v.

MACQUARIE INVESTMENTS US, INC.,
PRASHANT MUPARRAPPU and OZZIE
PAGAN

                         Defendants.

_____/

## <u>VERIFICATION AFFIDAVIT OF VICTOR FERREIRA</u>

STATE OF NEW YORK     )
                            ) ss:
COUNTY OF NASSAU      )

        BEFORE ME personally appeared Victor Ferreira, who, after being duly sworn, deposes and states:

        1.     I am over the age of 18, and I have personal knowledge of the facts set forth in this Affidavit.

        2.     I am the Chief Executive Officer of Vantage Commodities Financial Services, LLC ("Vantage"), and I make this affidavit on behalf of Vantage with full authority.

        3.     The foregoing Verified Amended Complaint for Damages is true to my knowledge, except as to the matters therein stated to be alleged on information and belief, and that as to those matters I believe them to be true.

1

FURTHER AFFIANT SAYETH NAUGHT.

I declare under penalty of perjury that the foregoing is true and correct. Executed on June 18, 2020.

Vantage Commodities Financial Services, LLC
By: Victor Ferreira

2